UNITED STATES DISTRICT COURT                     FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

GARNIE GUNN,
                                                        MEMORANDUM
                                    Plaintiff,          AND ORDER
                                                        10-cv-00043
                    - versus -

HYTROL CONVEYOR CO., INC; CENTURY
CONVEYOR SERVICE, INC.; and APPLE
CONVEYOR, INC.,

                                    Defendants.

APPEARANCES:

            THE LAW OFFICES OF JOSEPH MONACO, PC
                    1500 Broadway – 21st Floor
                    New York, New York  10036
            By:     Joseph D. Monaco
                    *Attorney for Plaintiff*

            STRONGIN ROTHMAN & ABRAMS, LLP
                    5 Hanover Square, 4th Floor
                    New York, NY  10004
            By:     Howard F. Strongin
                    *Attorneys for Defendant, Hytrol Conveyor Co., Inc.*

JOHN GLEESON, United States District Judge:

            Garnie Gunn ("Gunn") commenced this diversity action against Hytrol Conveyor

Co., Inc. ("Hytrol"); Century Conveyor Service, Inc. ("Century"); and Apple Conveyor, Inc.

("Apple"), alleging breach of warranty, strict liability, and negligence.  The claims arise out of

an accident on January 29, 2007, in which Gunn sustained injuries to his left hand while

attempting to clear a jam in a conveyor belt.  Hytrol, the only defendant remaining in the case,[1]

---

[1]        On July 31, 2012 Gunn, Century, and Apple filed a Stipulation of Discontinuance, ECF No. 30, as
to Century and Apple, which I so ordered on August 1, 2012.

moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. For the reasons stated below, the motion is granted in part and denied in part.

BACKGROUND

A.    *The Accident*

On January 29, 2007 Gunn was working as a maintenance engineer in a Duane Reade distribution facility in Maspeth, New York.  Strongin Decl. Ex. C, at 50:18-51:5 (Gunn Dep.); Strongin Decl. Ex. H, at 1 (Ehrlich Rep.).[2]  Gunn's responsibilities included manning two baler machines, which each received cardboard via a chute at the end of a conveyor belt. Strongin Decl. Ex. C, at 61:2-5, 62:12-22, 163:17-164:9 (Gunn Dep.).  This job entailed ensuring that the cardboard flowed from the conveyor belt to the baler machines without jamming.  *Id*. at 72:12-25.  In order to clear a jam, Gunn would stand on top of the baler machine to gain access to the conveyor belt and chute and push the cardboard free with his hands or a stick.  *Id*. at 73:2-6, 73:22-74:23.

In the moments prior to the accident, Gunn noticed cardboard stuck in the rollers of the conveyor belt.[3]  *Id*. at 179:5-180:6.  Gunn climbed onto the baler machine and tried to free the cardboard from the rollers using his left hand.[4]  *Id*. at 185:24-186:15, 189:24-190:16.  The conveyor belt remained in motion while Gunn attempted to remove the cardboard.  *Id*. at 192:13-18.  As Gunn tried to dislodge the cardboard, his left hand, wrist, and forearm got caught in the rollers.  *Id*. at 194:25-195:21, 200:14-202:6.  Gunn sustained injuries to his left hand, wrist, and forearm.  Monaco Decl. Ex. A to Ex. N, at 2-5 (Schuster Rep.).

---

[2]    Ehrlich's report erroneously reports the date of the accident as January 9, 2007.
[3]    What Gunn refers to as the "rollers" is technically two separate components of the conveyor belt – the "tail pulley" and the "snub idler" – which are described in more detail below.  *See* Strongin Decl. Ex H, at 4 (Ehrlich Rep.).
[4]    The terminus of the conveyor belt was approximately 123 inches (or 10.25 feet) off the ground. *Id*. at 2.

B.      *The Hytrol Model TH Conveyor Belt*

Hytrol designed and manufactured the subject conveyor belt, which is a Model

TH.  Strongin Decl. Ex. D, at 18:10-17; 67:11-16 (Bonham Dep.).  The design of the Model TH

conveyor belt includes a guard – the "dust pan cover"[5] – located on the underside of the belt near

its terminus.  *Id*. at 88:14-89:2.  As the conveyor belt reaches its terminus, it goes around a "tail

pulley,"[6] which is a "metal cylinder with a shaft that runs through it."  *Id*. at 69:17-23.  As the

belt goes around the tail pulley and begins moving in the opposite direction, it goes over a "snub

idler,"[7] which helps to steer the belt and lift it as it winds its way back to its starting point.  *Id*. at

81:18-83:3.

The dust pan cover serves as a physical barrier preventing access to "in running

nip points."  *Id*. at 93:22-94:2, 96:4-8, 96:24-97:11.  An in running nip point is the point "where .

. . two moving parts are coming closer and closer . . . to the point of touching."  *Id*.  at 83:16-23.

At the terminus of the Model TH conveyor belt, there are three such points: (1) where the tail

pulley comes into contact with the "bed spacer," which is a rod holding together the two sides of

the "bed" over which the belt moves; (2) where the snub idler comes into contact with the tail

pulley; or (3) where the snub idler comes into contact with the moving belt.  Strongin Decl. Ex.

H, at 3-4 (Ehrlich Rep.).  The design of the Model TH conveyor belt also includes a warning

sticker indicating the presence of an in running nip point near its terminus.  Strongin Decl. Ex. D,

at 144:10-22, 146:25-147:10 (Bonham Dep.).

Hytrol ships conveying equipment to the end user in pieces, which are typically

assembled on site by a separate installation company.  *Id*. at 39:5-25.  When Hytrol ships the

Model TH conveyor belt to the end user, it includes dust pan covers along with the other

---

[5]      The "dust pan cover" is alternatively referred to as an "end roller cover" in the record.
[6]      The "tail pulley" is alternatively referred to as a "discharge pulley" in the record.
[7]      The "snub idler" is alternatively referred to as a "snub roller" in the record.

components of the conveyor belt. *Id*. at 73:21-74:11. The covers are then installed on the conveyor belt on site.[8] *Id*. at 74:5-13, 88:22-89:15. Similarly, warning stickers are included in the shipment of the Model TH conveyor belt and are affixed by the installation company on site. *Id*. at 149:3-7.

C.   *The Installation of the Subject Model TH Conveyor Belt*

Century is a conveyor systems integrator business,[9] Strongin Decl. Ex. F, at 8:8-10 (Byington Dep.), and an authorized seller of Hytrol conveying equipment, Strongin Decl. Ex. E, at 8:20-22 (Gritschke Dep.). Hytrol sold the subject Model TH conveyor belt to Century.[10] Strongin Decl. Ex. D, at 138:10-23, 154:18-21 (Bonham Dep.). Duane Reade contracted with Century to design and install the subject conveyor belt at its distribution facility. Strongin Decl. Ex. E, at 14:15-18, 15:12-20 (Gritschke Dep.); Strongin Decl. Ex. F, at 44:15-21, 45:9-13, 46:21-25 (Byington Dep.). One of the services Century provides is to conduct "field commissioning and performance testing" of newly installed conveyor systems to ensure that the system operates as designed. Strongin Decl. Ex. E, at 27:14-28:6 (Gritschke Dep.). This service includes ensuring that all safety equipment is properly installed and functioning. *Id*. at 29:7-19. The conveyor system is not considered ready to be turned over to the end user until the field commissioning and performance testing is complete. *Id*. at 28:23-29:6; Strongin Decl. Ex. F, at 49:9-18 (Byington Dep.).

---

[8]   Hytrol ships the Model TH conveyor belt in 10' sections. Strongin Decl. Ex. D, at 71:19-23 (Bonham Dep.). End users who order a Model TH conveyor belt that is composed of a single 10' section receive the belt with the dust pan cover pre-installed. *Id*. at 72:24-73:7. However, end users who order Model TH conveyor belts composed of multiple 10' sections must install the covers on site because the sections must be "attached and bolted together" before the covers can be put in place. *Id*. at 74:5-75:11. The Model TH that Hytrol shipped to Duane Reade was composed of more than one 10' section. *Id*. at 79:7-9.

[9]   As a conveyor systems integrator, Century serves as a "one-shop-stop" that sells, designs, engineers, programs, and installs conveyor systems. Strongin Decl. Ex. F, at 8:9-19 (Byington Dep.).

[10]   In its Response to Hytrol's Rule 56.1 Statement, Gunn disputes this fact on the ground that Hytrol offers no supporting citation to the record. Gunn Rule 56.1 Resp. ¶ 5. This fact is, however, supported by the record. In his deposition, Boyce Bonham, Director of Services Operation for Hytrol, testified to the fact that Hytrol sold the subject Model TH conveyor belt to Century. Strongin Decl. Ex. D, at 138:10-23, 154:18-21 (Bonham Dep.).

Century subcontracted with Apple to physically install the subject conveyor belt. Strongin Decl. Ex. E, at 36:9-10 (Gritschke Dep.); Strongin Decl. Ex. F, at 47:2-6 (Byington Dep.).  Hytrol shipped it in pieces to Duane Reade in November 2006, Strongin Decl. Ex. D, at 30:21-25; 71:19-23, 73:11-74:4 (Bonham Dep.), and Apple began installing it sometime in mid-December 2006, Strongin Decl. Ex. G, at 19:11-13 (Orchard Dep.).  Apple informed Century that the shipment contained incorrectly-sized dust pan covers.  *Id*. at 49:3-8, 75:21-76:8.  On December 22, 2006 Century informed Hytrol that its shipment contained six incorrect dust pan covers.  Strongin Decl. Ex. D, at 162:21-163:11 (Bonham Dep.).  Hytrol shipped the correct dust pan covers to the Duane Reade distribution facility via FedEx sometime around January 10, 2007.[11]  *Id*. at 167:5-23; Strongin Decl. Ex. F, at 77:4-17, 78:6-10 (Byington Dep.).  The correct dust pan covers were delivered to the facility on January 11, 2007.[12]  Strongin Decl. Ex. D, at 167:24-168:3 (Bonham Dep.).

On the date of Gunn's accident – January 29, 2007 – Century had not yet "commissioned" or turned the subject conveyor belt over to Duane Reade for use, but the conveyor belt was operational.  Strongin Decl. Ex. F, at 83:11-84:3, 84:13-23 (Byington Dep.).  There was no dust pan cover installed near the terminus of the subject conveyor belt at the time of Gunn's accident.  Strongin Decl. Ex. C, at 136:20-137:4, 139:13-140:4 (Gunn Dep.).  There was no warning sticker indicating the presence of an in running nip point near the terminus of the belt at the time of Gunn's accident.  Strongin Decl. Ex. D, at 152:5-17 (Bonham Dep.).

---

[11]     The record indicates that the anticipated ship date was January 10, 2007.  Strongin Decl. Ex. F, at 82:4-15 (Byington Dep.).

[12]     Gunn disputes that the dust pan covers were ever "received by Duane Reade" because they were "never located."  Gunn Rule 56.1 Resp. ¶ 16.  The record does indicate, however, that the covers were delivered to the Duane Reade distribution facility by FedEx on January 11, 2007.  *Id*. at 167:24-168:3; 225:22-226:10.

D.    *Expert Reports*

Gunn retained Harry Ehrlich, an engineer, as an expert.  Ehrlich opined that the absence of "adequate guarding" to protect Gunn from in running nip points rendered the subject conveyer belt defective, "unreasonably dangerous and unsuitable for its intended purpose." Strongin Decl. Ex. H, at 10 (Ehrlich Rep.).  He further opined that Hytrol's failure to provide "adequate on-product warning labels and safety instructions was a 'design defect.'"  *Id*. at 11. He concluded that these defects – *i.e.*, the absence of guarding and warning labels – were causes of Gunn's injury.  *Id*. at 10-11.

Ehrlich found that Hytrol should have worked with Century to implement procedures to ensure that (1) conveyor belts were turned over to end users with all guards and warning labels in place and (2) conveyor belts that lacked guards and warning labels were made inoperative.  *Id*. at 10.  Specifically, he found that Hytrol should have coordinated the shipment of the correct dust pan covers with both Century and Duane Reade and verified that they were both received and installed.  *Id*.  Moreover, he found that Hytrol should have informed both Century and Duane Reade that the subject conveyor belt was not to be used until the correct dust pan cover was installed.  *Id*.

Hytrol retained George Karosas, an engineer, as an expert.  Karosas opined that the subject conveyor belt was "reasonably safe and did not contain any defect that caused or contributed to Mr. Gunn's accident."  Monaco Decl. Ex. U, at 10 (Karosas Rep.).  He found that Gunn's accident was caused by a combination of (1) Century, Apple, and Duane Reade's failure to install the dust pan cover; (2) Duane Reade's failure to implement procedures for clearing jams, and to properly train and supervise Gunn to follow such procedures; and (3) Gunn's attempt to clear the jam while the conveyor belt was still in operation.  *Id*. at 11-12.

6

E.    *Procedural History*

Gunn commenced this action on January 6, 2010.  *See* Compl., ECF No. 1.

Hytrol filed its answer (and cross-claims against Century and Apple) on January 25, 2010.  *See*

Answer, ECF No. 7.  The parties completed discovery on February 7, 2013.  *See* Hytrol Mot.

Extension Time File Mot. Summ. J., ECF No. 35 (observing that last expert deposition took

place on February 7, 2013).  Hytrol filed its motion for summary judgment on April 4, 2013.  I

heard oral argument on the motion on May 21, 2013.

DISCUSSION

A.    *Summary Judgment Standard*

A court may grant summary judgment where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A fact is "material" if its resolution "might affect the outcome of

the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Id.*  In determining whether there are genuine disputes of material fact,

the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought."  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir.

2003).

B.    *Analysis*

1.    *Breach of Warranty*

Hytrol moves for summary judgment on Gunn's breach of implied warranty and

express warranty claims.  Hytrol contends that it is entitled to summary judgment on the breach

of implied warranty claim because such warranties were excluded by Hytrol's express warranty.

It contends that it is entitled to summary judgment on the breach of express warranty claim because its performance did not trigger the warranty.  Alternatively, Hytrol argues that even if its performance did trigger the express warranty, Gunn is contractually limited from recovering under the warranty.

a.    *Breach of Implied Warranty*

Two sections of New York's Uniform Commercial Code ("N.Y. U.C.C.") create implied warranties.  Sections 2-314 and 2-315 of the U.C.C. respectively imply warranties of merchantability and fitness for a particular purpose.  Section 2-316 permits sellers to exclude implied warranties.  To exclude the implied warranty of merchantability, the language disclaiming the warranty must use the word "merchantability," and if the exclusion is in writing, it must be "conspicuous."  N.Y. U.C.C. § 2-316(2).  To exclude the implied warranty of fitness, the exclusion "must be by a writing and conspicuous."  *Id.*  A clause is conspicuous

> when it is so written that a reasonable person against whom it is to operate ought to have noticed it. . . .  Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. . . .  Whether a term or clause is 'conspicuous' or not is for decision by the court.

*Id*. § 1-201(10).

Hytrol's express warranty explicitly states, "HYTROL EXPRESSLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."  Strongin Decl. Ex. J (Hytrol Warranty).  This language meets the standards required by the N.Y. U.C.C. to waive the implied warranties of merchantability and fitness for a particular purpose.  It expressly disclaims the implied warranties, the disclaimer is

8

conspicuously set forth in all capital letters, and it features the word "MERCHANTABILITY."

Thus, the express warranty effectively excluded any implied warranties.

Gunn's argument to the contrary is premised solely on the contention that a seller

cannot exclude or limit implied warranties with respect to personal injury claims.  In support of

this argument, Gunn cites N.Y. U.C.C. § 2-318, which states,

> A seller's warranty whether express or implied extends to any
> natural person if it is reasonable to expect that such person may
> use, consume or be affected by the goods and who is injured by
> breach of the warranty.  A seller may not exclude or limit the
> operation of this section.

Gunn presumably relies for its argument on the last sentence of this provision, which states that,

"A seller may not exclude or limit the operation of this section."

The purpose of N.Y. U.C.C. § 2-318 is " to give certain beneficiaries the benefit

of the same warranty which the buyer received in the contract of sale, thereby freeing any such

beneficiaries from any technical rules as to '[p]rivity.'"  N.Y. U.C.C. § 2-318 cmt. 2.  In other

words, as Hytrol observes in its motion papers, this section permits Gunn to benefit from any

implied or express warranties made by Hytrol to Century, which purchased the subject conveyor

belt.  Hytrol Mem. in Supp. Mot. Summ. J. 9, ECF No. 37-2.  The Official Comment to the

statute explains that the last sentence of this provision "does not mean that a seller is precluded

from excluding or disclaiming a warranty which might otherwise arise in connection with the

sale provided such exclusion or modification is permitted by Section 2-316."  N.Y. U.C.C. § 2-

318, cmt. 1.  Rather, "[w]hat this last sentence forbids is exclusion of liability by the seller to the

persons to whom the warranties which he has made to his buyer would extend under this

section."  *Id*.  Since Gunn has properly excluded any implied warranties pursuant to N.Y. U.C.C.

§ 2-316, Gunn's argument is without merit.  Accordingly, Hytrol's motion for summary

judgment is granted with respect to this claim.

b.   *Breach of Express Warranty*

Section 2-313 of the N.Y. U.C.C. governs express warranties.  Pursuant to this

section, a seller creates an express warranty by

> (a)  Any affirmation of fact or promise made . . . to the
> buyer which relates to the goods and becomes part of the basis of
> the bargain . . . .
>
> (b)  Any description of the goods which is made part of the basis of
> the bargain . . . .
>
> (c)  Any sample or model which is made part of the basis of the
> bargain . . . .

N.Y. U.C.C. § 2-313(1).  In order to demonstrate the creation of an express warranty under New

York law, a plaintiff "must prove that the statement falls within the definition of a warranty, that

she relied on it, and that it became part of the basis for the bargain."  *Kraft v. Staten Island Boat*

*Sales, Inc.*, 715 F. Supp. 2d 464, 473 (S.D.N.Y. 2010) (quoting *Daley v. McNeil Consumer*

*Products, Co.*, 164 F. Supp. 2d 367, 377 (S.D.N.Y. 2001)).

Hytrol's express warranty states that Hytrol "warrants that goods sold by Hytrol

and shipped on or after January 1, 2003 will be free from defects in material and workmanship

for a period of one year from date of shipment or 4,200 hours of operation, whichever comes

first."  Strongin Decl. Ex. J (Hytrol Warranty).  The warranty limits Hytrol's obligation "to

repair or replace, at Hytrol's option, F.O.B. Jonesboro, Arkansas, any part or goods proving

defective within the terms and period of this warranty."  *Id*.  It disclaims the extension of such

obligation "to failure or damage due to abuse, neglect, accident, improper repair, maintenance,

installation or adjustment, exposure to corrosive or abrasive material, operation under any degree of dampness, or alteration or modification by persons other than Hytrol." *Id*.

The concept of "defect" varies by context.  For example, as the New York Court of Appeals has held,

> Although the products liability theory sounding in tort and the breach of implied warranty theory authorized by the UCC coexist and are often invoked in tandem, the core element of "defect" is subtly different in the two causes of action. . . . .
>
> This distinction between the 'defect' analysis in breach of implied warranty actions and the 'defect' analysis in strict products liability actions is explained by the differing etiology and doctrinal underpinnings of the two distinct theories.  The former class of actions originates in contract law, which directs its attention to the purchaser's disappointed expectations; the latter originates in tort law, which traditionally has concerned itself with social policy and risk allocation by means other than those dictated by the marketplace.

*Denny v. Ford Motor Co.*, 87 N.Y. 2d 248, 254-56 (N.Y. 1995); *see also Castro v. QVC Network, Inc.*, 139 F.3d 114 (2d Cir. 1998) (comparing the meaning of "defect" in strict liability and implied warranty claims).  Similarly,

> There is also a distinction between negligence or strict liability claims, on the one hand, and breach of express warranty claims; the latter, including those involving warranties against 'defects' in a product, are judged according to the meaning of the words of the warranty, which may draw upon the reasonable expectation of both the consumer and the warrantor.

*Fanok v. Carver Boat Corp., LLC*, 576 F. Supp. 2d 404, 411 (E.D.N.Y. 2008); *see also Scientific Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-cv-1851, 2006 WL 2524187, at *7 (E.D.N.Y. Aug. 30, 2006) (defining "defect" according to "its plain and ordinary meaning" where seller warranted that product would be without "defect in material or workmanship")

(citing *In re Prudential Lines Inc.,* 158 F.3d 65, 77 (2d Cir. 1988) ("Unambiguous terms are to be given their 'plain and ordinary' meaning.")).

Gunn asserts that "[t]he express warranty that the product delivered to Duane Reade conformed with the design specifications was clearly violated by the failure to provide the proper guarding and warning stickers."  Gunn Mem. in Opp. Mot. Summ. J. 21.  The critical question, therefore, is whether Hytrol's failure to provide correct dust pan covers and warning stickers constitutes a "defect in material."[13]  The plain and ordinary meaning of "defect," in this context, refers either to "an irregularity in a surface or a structure that spoils the appearance or causes weakness or failure: fault, flaw, shortcoming" or the "want or absence of something necessary for completeness, perfection, or adequacy in form or function: deficiency, weakness." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 591 (1993).  The plain and ordinary meaning of "material," in this context, is "the finished stuff of which something physical . . . is made."  *Id.* at 1392.  Succinctly, the plain and ordinary sense conveyed by "defect in material" is a flaw in one of the components of the conveyor belt.

I conclude that Hytrol's failure to provide correct dust pan covers does not constitute a "defect in material."[14]  It is true that "defect" can connote something missing – *i.e.* the "want or absence of something necessary" – and Hytrol's original shipment of the conveyor belt to Duane Reade failed to include the correct dust pan covers.  But the failure to include the correct dust pan covers would constitute a "defect" in the overall shipment of the conveyor belt, not a "defect" in any of the components of the belt.

---

[13]      "Workmanship" refers to "something that is effected, made, or produced: manufacture." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2635 (1993).  Gunn's position that Hytrol violated the warranty by failing "to provide the proper guarding and warning stickers" implicates the "material" as opposed to the "workmanship" or manufacture of the subject conveyor belt.

[14]      The record is unclear as to whether Hytrol failed to ship the warning stickers to Duane Reade or Century/Apple failed to affix such stickers to the subject conveyor belt.  In any event, this fact has no material bearing on my conclusion that Hytrol did not breach its express warranty.

This understanding is buttressed by a broader reading of the express warranty. The warranty provides that "Hytrol's sole obligation under this warranty shall be to repair or replace . . . *any part or goods proving defective* within the terms and period of this warranty." Strongin Decl. Ex. J (Hytrol Warranty) (emphasis added). It further states that the "[b]uyer shall bear responsibility for the cost of labor and other charges for removal of *defective part or goods* and installation of the replacement part or goods." *Id*. (emphasis added). This language, particularly the use of "defective" to modify "part" and "goods," makes clear that Hytrol's express warranty extends to defective *components* of the conveyor belt. Gunn does not allege, nor does the record indicate, a "defect" in any of the components of the subject conveyor belt. Accordingly, Hytrol's motion for summary judgment is granted with respect to the breach of express warranty claim.[15]

2.      *Strict Products Liability*

Hytrol moves for summary judgment on Gunn's strict products liability claims, claiming that the subject conveyor belt had no manufacturing or design defects and that it had no duty to warn Gunn about the danger that caused his injury.

a.      *Strict Products Liability Generally*

New York embraced the doctrine of strict products liability in *Codling v. Paglia*, 32 N.Y. 2d 330 (N.Y. 1973). The *Codling* court recognized four primary rationales underlying the development of this doctrine. *See Larney v. Foley*, 594 N.Y.S. 2d 490, 497 (4th Dep't 1993). First, the manufacturer "unquestionably intends and expects that the product will be purchased and used in reliance upon his express assurance of its quality and . . . [h]aving invited and solicited the use, the manufacturer should not be permitted to avoid responsibility when the

---

[15]      Because I agree with Hytrol that its performance did not trigger the express warranty, I need not reach its alternative argument that Gunn's remedy under the warranty is contractually limited.

expected use leads to injury and loss." *Codling*, 32 N.Y. 2d at 339.  Second, the manufacturer is

best positioned "to know and to understand when an article is suitably designed and safely made

for its intended purpose." *Id*. at 340.  Third, the manufacturer bears the cost of accidents better

than the consumer.  *Id*. at 341.  Finally, the doctrine encourages manufacturers to produce, sell,

and distribute safer goods.  *Id*.

>   To recover under strict products liability, a plaintiff must demonstrate that

>   (1) the product is "defective" because it is not reasonably safe as
>   marketed; (2) the product was used for a normal purpose; (3) the
>   defect was a substantial factor in causing the plaintiff's injuries; (4)
>   the plaintiff by the exercise of reasonable care would not have both
>   discovered the defect and apprehended its danger; [and] (5) the
>   plaintiff would not have otherwise avoided the injury by the
>   exercise of ordinary care.

*Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991) (quoting *Wolfgruber v. Upjohn Co.*, 423

N.Y.S. 2d 95, 97 (4th Dep't 1979), *aff'd*, 52 N.Y. 2d 768 (N.Y. 1980)).  Under New York law, a

plaintiff may allege that a product is defective for one of three reasons: (1) manufacturing defect,

(2) design defect, or (3) failure to warn.  *Id*. (citing *Voss v. Black & Decker Manufacturing Co.*,

59 N.Y. 2d 102 (N.Y. 1983)); *see also McCarthy v. Olin Corp.*, 119 F.3d 148, 154 (2d Cir. 1997)

(stating that three separate actions exist under New York law for product defect: manufacturing

defect, design defect, and warning defect).  Gunn asserts all three forms of defect in the subject

conveyor belt.

>   (1)   *Manufacturing Defect*

Under New York law,

>   [t]o plead and prove a manufacturing flaw under either negligence
>   or strict liability, the plaintiff must show that a specific product
>   unit was defective as a result of "some mishap in the
>   manufacturing process itself, improper workmanship, or because

14

defective materials were used in the construction," and that the
defect was the cause of plaintiff's injury.

*Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001) (quoting

*Caprara v. Chrysler Corp.*, 52 N.Y. 2d 114, 129 (N.Y. 1981)).  A manufacturing defect exists

"when the unit in question deviates in quality and other performance standards from all of the

other identical units."  *Id*. (citing *Perazone v. Sears, Roebuck & Co.*, 515 N.Y. 2d 908, 911 (3d

Dep't 1987).  "The crux of a strict liability manufacturing defect claim is the product's failure to

perform as expected due to an error in the manufacturing process that resulted in a defect."

*Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 560 (S.D.N.Y. 2005) (quoting *Rainbow v.

Albert Elia Building Co.*, 436 N.Y.S. 2d 480 (4th Dep't 1981), *aff'd*, 56 N.Y. 2d 550 (N.Y.

1982)).

Gunn asserts that the subject conveyor belt had a manufacturing defect because it

"failed to meet the manufacturer's own design specifications in that it failed to include: (a)

properly sized dust pan guards; and (b) required warning stickers in the area where the accident

occurred."  Gunn Mem. in Opp. Mot. Summ. J. 6.  Hytrol contends that its original shipment of

the incorrectly sized guards does not constitute a manufacturing defect.  Hytrol Mem. in Supp.

Mot. Summ. J. 7.  It further argues that "any lack of warnings is the subject of a separate and

distinct claim for strict product liability based on a warning defect, not manufacturing or design

defect." *Id*.

Hytrol has the better of the argument.  "Manufacturing defects, by definition, are

imperfections that inevitably occur in a typically small percentage of products of a given design

as a result of the fallibility of the manufacturing process."  *Caprara*, 52 N.Y. 2d at 128 (Jason,

Jones, and Meyer, Js., dissenting).  A product with a manufacturing defect "is flawed because it

is misconstructed without regard to whether the intended design of the manufacturer was safe or

not." *Id*. at 128-29.  "Common examples of manufacturing defects are the proverbial hairline

fracture in the exploding bottle or the flawed piece of metal in the automobile steering column."

*Id*. (citing *Victorson v. Bock Laundry Machine Co.*, 37 N.Y. 2d 395 (N.Y. 1975); *Codling*, 32

N.Y. 2d 330).

      Gunn fails to allege, nor does the record indicate, that any component of the

subject conveyor belt exhibited a defect as a result of the manufacturing process.  The crux of

Gunn's claim is not that any component of the conveyor belt was defective, but that Hytrol failed

to ship the proper components to Duane Reade.  Indeed, plaintiff's expert, while describing the

subject conveyor as "defective," does not suggest that the defect arose out of the manufacture or

construction of the belt or its components.  Strongin Decl. Ex. H, at 10 (Ehrlich Report).  Rather,

the expert concluded that the defect lay in Hytrol's "failure to ensure the presence of the guard"

(*i.e.* dust pan cover) on the subject conveyor belt.  *Id*. at 10-12.  Accordingly, Hytrol's motion

for summary judgment is granted with respect to the manufacturing defect claim.[16]

      (2)    *Design Defect*

      Under New York law, a plaintiff establishes a prima facie case for strict liability

based on a design defect if he can demonstrate that the manufacturer "marketed a product

designed so that it was not reasonably safe and that the defective design was a substantial factor

in causing [his] injury."  *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 132 (2d Cir. 1999)

(quoting *Voss*, 59 N.Y. 2d at 107).  A product that is "not reasonably safe" is one "which, if the

design defect at the time were known at the time of manufacture, a reasonable person would

conclude that the utility of the product does not outweigh the risk inherent in marketing a product

designed in that manner."  *Voss*, 59 N.Y. 2d at 108.  The burden is on the plaintiff "to present

---

[16]    Because manufacturing defect claims are analyzed identically under strict liability and negligence
theories of recovery, I grant Hytrol's motion for summary judgment as to this claim under both theories.

evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Id*.

Gunn asserts that the subject conveyor belt had a design defect because Hytrol designed it with "removable" dust pan covers in the area where the accident occurred; "anticipated that the guards would be removed for maintenance and cleaning of debris;" and "anticipated that debris/refuse would build up in the area of the dust pan cover." Gunn Mem. in Opp. Mot. Summ. J. 12. Gunn also contends that a feasible alternative to the dust pan covers on the Model TH conveyor belt was a "U" shaped snub idler guard used with other Hytrol models of conveyor belts. *Id*. at 12-14. Hytrol counters that Gunn has failed to offer any evidence that the dust pan cover, when installed, is "not reasonably safe." Hytrol Reply Mot. Summ. J. 5. Hytrol further argues that Gunn has similarly failed to offer any evidence that the "U" shaped snub idler guard was a feasible, safer alternative to the dust pan cover. *Id*. at 4-5.

Gunn's argument, which posits that the "defect" in question is the removability of the dust pan covers, is puzzling. It may be true that the removability of the dust pan covers constitutes a design defect. But that purported defect bears no relation to the circumstances of Gunn's particular accident. In other words, it was not a factor, let alone a substantial factor, in causing Gunn's injury. The dust pan cover was never installed and then removed "for maintenance and cleaning of debris" from the subject conveyor belt. Plaintiff's own expert admitted as much:

> Q.     What is the design defect?
>
> A.     Well, given that you've got the dustpan [cover] . . . [it's] installed with thumb screws. And an effective barrier guard is one that should be installed such that it's a fixed barrier and requires tools to remove. . . .

17

> Q.      Well, what does any of that have to do with the fact that the claim in this case is quite simply that the guard that should have been there wasn't there?
>
> A.      Well, you asked me if I saw any defects, so that's a defect that I see in the design.
>
> Q.      But what is the proximate cause or the reasonable relationship between the thumb screws that were used and the happening of this incident? . . .
>
> A.      Well, they weren't causative because they weren't there.  I mean the cause here is that the guard was missing.

Strongin Decl. Ex. I, at 38:17-40:6 (Ehrlich Dep.).  Rather, it is undisputed that the dust pan cover was never installed on the subject conveyor belt up to the time of Gunn's accident.

Hytrol posits that the relevant question is whether the dust pan cover, when installed, is "not reasonably safe."  It strikes me that the proper framing of the issue is not whether the design of the subject conveyor belt – with the dust pan cover – is defective, but rather whether the design of the belt is defective because it can operate *without* the dust pan cover.  The former inquiry seems appropriate for a situation where a plaintiff was injured by a conveyor belt that was operating with the dust pan cover.  The latter inquiry bears a closer relation to the actual circumstances of the case, where Gunn was injured by a conveyor belt that was operating *without* a dust pan cover.

Under New York law, "[a] manufacturer may be liable where plaintiffs adduce evidence to show that a product was purposefully manufactured to permit use without a safety feature."  *Colon*, 199 F. Supp. 2d at 87 (citing *Lopez v. Precision Papers, Inc.*, 67 N.Y. 2d 871, 873 (N.Y. 1986)).  Here, Gunn presents evidence raising a triable issue of fact as to whether Hytrol purposefully manufactured the subject conveyor belt so as to permit use without the dust pan covers.  *See Lopez*, 67 N.Y. 2d at 873 (finding triable issue of fact as to whether a "forklift,

as marketed with an attached but removable overhead safety guard, was 'not reasonably safe'"); *Rios v. Rockwell International Corp.*, 701 N.Y.S.2d 386, 386 (1st Dep't 2000) (affirming lower court's finding of triable issue of fact as to whether "a press . . . designed so as to be operable without a safety guard, was reasonably safe for its intended uses when placed in the stream of commerce"); *Tuesca v. Rando Machine Corp.*, 640 N.Y. 2d 106, 107 (1st Dep't 1996) (finding triable issue of fact as to whether "defendant purposefully manufactured the 'even feed machine' to permit its use without the safety plexiglass guard"); *O'Bara v. Piekos*, 555 N.Y.S. 2d 939, 941 (4th Dep't 1990) (holding "it is for a jury to decide . . . whether the saw was purposefully manufactured and assembled to permit its use without a chain brake, the scope of such use, and whether the product was reasonably safe when sold").  It is undisputed that the Model TH conveyor belt can operate without the dust pan cover.  In fact, there is evidence in the record that Hytrol expected that, in some circumstances, the conveyor belt could operate safely without the need for the dust pan cover.  *See, e.g.* Strongin Decl. Ex. D, at 168:10-18 (Bonham Dep.) ("Q. Was it safe to operate . . . without the dust pan [cover] in place?  A.  It is quite possible it was.  I know that the dust pan [cover] on the discharge end where this injury took place was guarded by location alone.  That particular area . . . it was safe to operate without the dust pan [cover] attached.").

Gunn has failed, however, to adduce evidence to demonstrate that there is a safer, feasible design alternative.  Gunn argues that the Model TH conveyor belt should have been designed to include a "U" shaped snub idler guard used with other Hytrol models of conveyor belts.  But the safeness of the dust pan covers is not at issue here.  Rather, the relevant inquiry is whether there was a safer, feasible design alternative to the Model TH conveyor belt – such as a belt that could not operate without the dust pan cover – and not to the dust pan cover itself.

19

Gunn present no evidence of the existence of a feasible design alternative to the subject conveyor belt. Because Gunn has failed to satisfy his "obligation to present evidence that . . . it was feasible to design the product in a safer manner," his design defect claim fails as a matter of law. Accordingly, Hytrol's motion for summary judgment is granted with respect to this claim.[17]

(3)    *Failure to Warn*

Under New York law, a plaintiff establishes a prima facie case for strict liability based on a failure to warn if he can demonstrate that (1) the manufacturer had a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm. *Colon*, 199 F. Supp. 2d at 84. New York recognizes two exceptions to a failure to warn claim. First,

> a safety device built into the integrated final product is often the
> most effective way to communicate that operation of the product
> without the device is hazardous. Thus, where the injured party was
> fully aware of the hazard through general knowledge, observation
> or common sense, or participated in the removal of the safety
> device whose purpose is obvious, lack of a warning about that
> danger may well obviate the failure to warn as a legal cause of an
> injury resulting from that danger.

*Liriano v. Hobart Corp.*, 92 N.Y. 2d 232, 241 (N.Y. 1998). Second, a "limited class of hazards need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks." *Id.* at 241-42 (noting that this exception is also called the "open and obvious danger exception").

---

[17]    Under New York law, design defect claims are virtually identical under strict liability and negligence theories of recovery. *Colon*, 199 F. Supp. 2d at 83 (citing *Searle v. Suburban Propane Division of Quantum Chemical Corp.*, 700 N.Y.S. 2d 588, 591 (3rd Dep't 2000) ("[I]n a design defect case, there is almost no difference between a prima facie case in negligence and one in strict liability.")). Accordingly, I grant Hytrol's motion for summary judgment as to this claim under both theories.

Gunn appears to claim Hytrol failed to warn in two respects.  First, he asserts that Hytrol failed to warn Gunn of the danger of in running nip points near the terminus of the conveyor belt, as demonstrated by the missing warning stickers.  Gunn Mem. in Opp. Mot. Summ. J. 15.  Second, Gunn asserts that Hytrol failed to warn Gunn not to operate the conveyor belt until the installation of the dust pan covers.[18]  *Id*. at 16.  Hytrol contends that the open and obvious danger exception bars this claim.  Hytrol Mem. in Support Mot. Summ. J. 15.  Alternatively, Hytrol argues that even if the open and obvious danger exception does not bar this claim, there is no causal link between its failure to warn and Gunn's injury.  *Id*. at 16-20.

(a)     *Open and Obvious Defense*

Under New York law, the open and obvious danger defense relieves manufacturers from a duty to warn "[w]here a danger is readily apparent as a matter of common sense."  *Liriano*, 92 N.Y. 2d at 242.  By contrast, "the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user."  *Liriano*, 92 N.Y. 2d at 242.  The defense is "difficult to administer in practice."  *Id*.  "Because of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question."  *Id*. (citing *Bolm v. Triumph Corp.*, 33 N.Y. 2d 151, 159-60 (N.Y. 1973)).  Indeed, a court should decide that a danger was open and obvious as a matter of law only in cases where "only one conclusion can be drawn from the established facts."  *Id*.

I find that Hytrol has failed to establish as a matter of law that the open and obvious defense bars this claim.  With respect to Hytrol's purported failure to warn Gunn of the

---

[18]     The distinction between the two types of failure to warn is one highlighted by the Second Circuit in *Liriano v. Hobart Corp.*, 170 F.3d 264 (2d Cir. 1999).  The former "states that a particular place, object, or activity is dangerous" (*i.e.*, the operation of the Model TH conveyor belt itself).  *Id*. at 270.  The latter "explains that people need not risk the danger posed by such a place, object, or activity in order to achieve the purpose for which they might have taken that risk" (*i.e.*, the operation of the Model TH conveyor belt without the dust pan cover).  *Id*. I address both types of failure to warn below.

danger of in running nip points, the record indicates that Hytrol produced warning stickers to be affixed near the terminus of the Model TH conveyor belt warning users of just such a danger. Strongin Decl. Ex. D, at 144:2-22, 146:10-18 (Bonham Dep.). That Hytrol produced such warning stickers does not necessarily foreclose the open and obvious defense. But it does suggest that the danger was "not readily apparent as a matter of common sense" and that the sticker added something "to the user's appreciation of the danger." *Liriano*, 92 N.Y. 2d at 242.

Moreover, the record suggests that there were "aspects of the hazard which [we]re concealed or not reasonably apparent to the user." *Liriano*, 92 N.Y. 2d at 242. The "rollers" of the subject conveyor belt are located on the underside of the belt. Boyce Bonham, Director of Services Operation for Hytrol, testified that Hytrol did not design any lights to illuminate that area. Strongin Decl. Ex. D, at 190:18-20 (Bonham Dep.). He further testified that "ambient lighting would be shadowed" in that area. *Id*. at 190:21-23. These facts suggest that Gunn may not have had a clear view of those rollers, obscuring aspects of the hazard, such as how quickly the rollers were moving.

Hytrol's open and obvious defense also falters against Gunn's assertion that Hytrol failed to warn Gunn not to operate the conveyor belt until the installation of the dust pan covers. By way of analogy, consider the Second Circuit's discussion of meat grinders in *Liriano v. Hobart Corp.*, 170 F.3d 264 (2d Cir. 1999):

> One who grinds meat, like one who drives on a steep road, can benefit not only from being told that his activity is dangerous but from being told of a safer way. As we have said, one can argue about whether the risk involved in grinding meat is sufficiently obvious that a responsible person would fail to warn of that risk, believing reasonably that it would convey no helpful information. But if it is also the case – as it is – that the risk posed by meat grinders can feasibly be reduced by attaching a safety guard, we have a different question. *Given that attaching guards is feasible,*

22

> *does reasonable care require that meat workers be informed that they need not accept the risks of using unguarded grinders?  Even if most ordinary users may – as a matter of law – know of the risk of using a guardless meat grinder, it does not follow that a sufficient number of them will – as a matter of law – also know that protective guards are available, that using them is a realistic possibility, and that they may ask that such guards be used.  It is precisely these last pieces of information that a reasonable manufacturer may have a duty to convey even if the danger of using a grinder were itself deemed obvious.*

*Id*. at 270-72 (emphasis added).  Similarly, here, there exists a triable issue of fact as to whether Hytrol had a duty to convey that a dust pan cover existed to protect users against the dangers of the Model TH conveyor belt and that the belt should be used only with such covers.  *Id*. at 271.

(b)     *Causation*

Hytrol argues that its failure to warn was not a proximate cause of Gunn's injury for two reasons.  First, Hytrol asserts that "Century's and/or Apple's failure to install the guard and Duane Reade's operation of the non-commissioner conveyor were [the] sole causes" of Gunn's accident.  Hytrol Mem. in Support Mot. Summ. J. 16.  In the alternative, Hytrol contends that "Century's and/or Apple's failure to install the guard and Duane Reade's operation of the non-commissioner conveyor were so unforeseeable as to amount to a superseding cause."  *Id*.

"For there to be recovery for damages stemming from a product defective because of the inadequacy or absence of warnings, the failure to warn must have been a substantial cause of the events which produced the injury."  *Billsborrow v. Dow Chemical, U.S.A.*, 579 N.Y.S. 2d 728, 733 (N.Y. 1992).  In New York, there exists "a presumption that a user would have heeded warnings if they had been given, and that the injury would not have occurred."  *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 338 (S.D.N.Y. 2006) (citation and internal quotation marks omitted); *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 441 (S.D.N.Y. 1999).  A defendant

"may rebut this presumption by introducing specific facts showing that the warning would have been futile." *Adesina*, 438 F. Supp. 2d at 338 (citation and internal quotation marks omitted). "If a failure to warn would have been futile, plaintiff cannot prove proximate causation." *Id*. "Generally, proximate cause is a question to be decided by the trier of the facts." *Nagel v. Brothers International Food, Inc.*, 825 N.Y.S. 2d 93, 95 (2d Dep't, 2006) (citing *Derdiarian v. Felix Contracting Corp.*, 51 N.Y. 2d 308, 315 (N.Y. 1980)).

Here, it is undisputed that warning stickers typically affixed near the terminus of the Model TH conveyor belt, warning of the danger of in running nip points, were never affixed to the subject conveyor belt. Strongin Decl. Ex. D, at 144:10-22, 146:10-18, 151:19-152:17 (Bonham Dep.). It is also undisputed that, after learning that it had shipped the incorrect dust pan covers to Duane Reade, Hytrol failed to warn Duane Reade – directly or indirectly – of the danger of operating the subject conveyor belt without the correct dust pan covers. *Id*. at 183:2-15. Gunn testified that he did not believe that clearing the jam from the subject conveyor belt while it was in motion posed any danger. Strongin Decl. Ex. C, at 193:3-19 (Gunn Dep.); *cf. Burke v. Spartanics*, 252 F.3d 131, 139 (2d Cir. 2001) ("[T]he plaintiff must show . . . that the failure to warn was a substantial cause of the events which produced the injury. And where the injured party was fully aware of the hazard through general knowledge, observation or common sense, lack of a warning about that danger may well obviate the failure to warn as a legal cause of an injury resulting from that danger.") (citations, internal quotation marks, and alterations omitted). Hytrol presents no facts to rebut the presumption that Gunn would have heeded warnings had they been given, thus preventing his injury from occurring. Accordingly, I cannot conclude, as a matter of law, that Hytrol's failure to warn was not a proximate cause of Gunn's injury.

Hytrol argues in the alternative that "Century's and/or Apple's failure to install the guard when it was delivered to the Duane Reade facility was an intervening or superseding cause." Hytrol Mem. in Support Mot. Summ. J. 18. "Where an intervening act combines with the defendant's conduct to produce the plaintiff's injury, 'liability turns upon whether the intervening act is a normal or forseeable consequence of the situation created by the defendant's negligence.'" *Billsborrow*, 579 N.Y.S.2d at 733 (quoting *Derdiarian*, 434 N.Y. 2d at 169). It follows that "an intervening act which is 'extraordinary under the circumstances, not forseeable in the normal course of events, or independent of or far removed from the defendant's conduct . . . may well be a superseding act which breaks the causal nexus.'" *Id*. The questions of "[w]hether an act is foreseeable and the course of events normal . . . are generally subject to varying inferences presenting issues for the fact finder to resolve." *Lynch v. Bay Ridge Obstetrical and Gynecological Associates, P.C.*, 536 N.Y.S. 2d 11, 13 (N.Y. 1988) (citing *Derdiarian*, 434 N.Y. S. 2d at 170).

In *Billsborrow*, the plaintiff commenced an action on behalf of her decedent husband, who died from injuries sustained after inhaling highly toxic vapors from a chlorinated solvent. 579 N.Y.2d 728. On appeal, the manufacturer of the solvent argued that plaintiff's employer's failure to warn the decedent or provide safety equipment constituted, as a matter of law, a superseding cause. *Id.* In rejecting this argument, the court held that "[t]he inadequacy of the warnings disseminated by [the manufacturer] in the chain of communication with respect to the product . . . threatened the ultimate end user . . . by creating a situation where the user may not have been aware of the hazards and the safety devices to protect against the hazards." *Id*. at 734. The court concluded that whether the plaintiff's employer's failure to warn the decedent or provide proper safety equipment "was so extraordinary as to fall outside the class of normal

consequences resulting from the main defendants' conduct presented a factual question for

resolution by a jury." *Id.*

Similarly, the record here does not support a conclusion that the failure by

Century and/or Apple to install the correct dust pan was an act "so extraordinary as to fall

outside the class of normal consequences resulting from" Hytrol's failure to warn.  Hytrol

asserts, in a conclusory fashion, that "[i]t is simply unimaginable that Century, a sophisticated

conveyor system integrator, would not install the correct guard, when it was shipped to Duane

Reade, and allow Duane Reade to operate the conveyor without the guard."  Hytrol Mem. in

Support Mot. Summ. J. 20.  But it fails to present specific facts going to the inconceivability of

such a scenario.  In fact, the record contains evidence supporting an opposite conclusion.  For

example, Charles Gritschke, the Century sales person responsible for selling the subject

conveyor belt to Duane Reade, testified that a scenario where Hytrol's shipment of replacement

parts directly to an end user resulted in their disappearance was fairly commonplace:

> Q.     In a scenario where you learn that there's a missing guard
> or a missing cover, somebody contacts Hytrol in this case and says,
> "Ship us a new guard as fast as possible."  What's done to make
> sure that once the guard is shipped from Hytrol that it actually gets
> onto the machine that needs it?
>
> A.     Well, there should be some communication to the installer
> saying that shipping is two days or one day.  And then once it's on
> site, we know it's on site, go over there and get that thing and get it
> installed.
>
> Q.     Would the part be shipped to Century, Apple or the
> customer, Duane Reade?
> A.     Depends.
>
> Q.     On what?
>
> A.     A lot of times if it's a small item we would have it shipped
> to our facility because if you ship it to a distribution center or a

customer, it could get lost in the shuffle.  If it's a large piece of
equipment, it normally would get shipped direct to the end user.

. . .

Q.     Is the concern about shipping it to the customer, in this case
Duane Reade's warehouse, that it might get lost in this huge
warehouse?

A.     Yes. I mean, I've had that happen or where even though
you've got a signature, you know, from the UPS delivery guy and
it was signed by, you know, the dock superintendent but he put it
somewhere and --

Q.     Poof! It's gone?

A.     Goes away. It gets lost.

Q.     How big is this warehouse at Duane Reade?

A.     I believe it's about 400,000 square feet.

Strongin Decl. Ex. E, at 43:21-44:17, 45:15-46:3.  Accordingly, I cannot find, as a matter of law,

that the failure by Century and/or Apple to install the correct dust pan cover when it was

delivered to the Duane Reade facility was a superseding cause interrupting the link between

Hytrol's failure to warn and Gunn's injury.[19]

CONCLUSION

For the reasons stated above, Hytrol's motion for summary judgment is granted as

to Gunn's breach of warranty, manufacturing defect, and design defect claims, but denied as to

his failure to warn claim.  The final pre-trial conference will be held on June 18, 2013 at 11:30

AM.  Jury selection and trial are set for June 24, 2013 at 9:30 AM.  Because the motion for

---

[19]     Under New York law, failure to warn claims are identical under strict liability and negligence
theories of recovery.  *Denny*, 87 N.Y. 2d at 258 ("Failure to warn claim . . . couched in terms of strict liability, is
indistinguishable from a negligence claim.").  Accordingly, I deny Hytrol's motion for summary judgment as to this
claim under both theories.

summary judgment was so well-briefed, the parties are not obligated to file a final pre-trial order

prior to the final pre-trial conference.

So ordered.

John Gleeson, U.S.D.J.

Dated:  May 21, 2013
            Brooklyn, New York